BOURNE v FARMERS INSURANCE EXCHANGE

Docket No. 98820. Argued April 5, 1995 (Calendar No. 17). Decided July 6, 1995.

Harry G. Bourne brought an action in the Genesee Circuit Court against Farmers Insurance Exchange, his no-fault insurer, for personal injuries inflicted during the theft of his vehicle. The court, Thomas C. Yeotis, J., granted summary disposition for the defendant, finding that the injuries did not arise out of the ownership or use of the motor vehicle, but denied the defendant costs and attorney fees because the claim was not frivolous. The Court of Appeals, CAVANAGH, P.J., and MARILYN KELLY and M. D. SCHWARTZ, JJ., in an opinion per curiam, reversed the grant of summary disposition and affirmed the denial of costs and attorney fees (Docket No. 144046). The defendant appeals.

In an opinion by Justice RILEY, joined by Chief Justice BRICKLEY, and Justices CAVANAGH, BOYLE, MALLETT, and WEAVER, the Supreme Court *held:*

There was not a sufficient causal connection between the injuries and the use of the motor vehicle as a motor vehicle to find liability on the part of the insurer. Because there was sufficient confusion in this area of the law, the plaintiff's claim was not frivolous, and the denial of attorney fees and costs was proper.

1. An insurer is required under MCL 500.3105(1); MSA 24.13105(1) to pay benefits where accidental bodily injury arises out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle. In this case, the plaintiff suffered a personal physical attack. Generally, such an attack is not compensable. The injuries did not arise out of the use of his vehicle as a motor vehicle; at best, the vehicle was the situs of

REFERENCES

Am Jur 2d, Automobile Insurance §§ 194-204, 340, 343; Automobiles and Highway Traffic §§ 345, 346.

Injury or death caused by assault as within coverage of no-fault motor vehicle insurance. 44 ALR4th 1010.

Automobile liability insurance: what are accidents or injuries "arising out of ownership, maintenance, or use" of insured vehicle. 15 ALR4th 10.

the injury, which is not sufficient to establish the requisite causal connection between the injury and the vehicle. The proper focus is on the relation between the injury and the use of a motor vehicle as a motor vehicle, not on the intent of the assailant.

2. Attorney fees and costs may be awarded if the plaintiff's claim is frivolous. Because there has been much debate regarding the scope of the phrase "arising out of the ownership, operation, maintenance, or use of a motor vehicle" in MCL 500.3105(1); MSA 24.13105(1), the plaintiff's claim was not frivolous. The defendant was properly denied costs and attorney fees.

Affirmed in part and reversed in part.

Justice LEVIN, dissenting, stated that Bourne's injury arose out of owning, operating, and using his motor vehicle as a motor vehicle, and thus he is entitled to no-fault benefits.

Carjacking is peculiar to motoring, in contrast with thefts and robberies generally; its costs are correctly allocated to motoring and should be covered by no-fault insurance. It has become a risk of driving, occurring during the normal use of a motor vehicle. If injury results from a physical attack that arises out of the ownership, operation, or use of a motor vehicle as a motor vehicle, no-fault benefits are payable.

The no-fault act provides that no-fault benefits are to be paid for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, not only for injury arising out of a traffic accident or maintenance of a motor vehicle. Where it cannot be said that the assailant might as easily have chosen to direct animus against the victim at some other time or place, the assault is random and is not directed against the victim personally, and the only reason the victim is at the place where the assault occurred is because of the use (including as an occupant) of a motor vehicle, the assault arises out of the use of a motor vehicle without regard to whether injury is the result of a collision or is suffered without a collision.

There is as much reason to socialize losses resulting from carjackings through a no-fault system as there is to socialize the cost of injuries caused by thieves fleeing the police. In both cases, the victim is injured as a result of using a vehicle as a vehicle.

203 Mich App 341; 512 NW2d 80 (1994) affirmed in part and reversed in part.

UAW-GM Legal Services Plan (by *Orene Bryant*) for the plaintiff.

*Hayduk, Andrews & Hypnar, P.C.* (by *Mark S. Hayduk* and *Paul J. Ellison*), for the defendant.

Amici Curiae:

*Gross, Nemeth & Silverman, P.C.* (by *James G. Gross* and *Steven G. Silverman*), for Auto Club Insurance Association and Michigan Association of Insurance Companies.

*Richard E. Shaw* and *Jeffrey T. Meyers* for the Michigan Trial Lawyers Association.

RILEY, J. In this case we are called upon to determine whether personal injury inflicted during the theft of a vehicle arises out of the use of that vehicle as a motor vehicle. Specifically, we must decide whether plaintiff's injuries to his face and ankle from the assailant's blow were the type of injuries that arise out of the normal use of a vehicle. Because this injury was a physical attack inflicted on plaintiff, we conclude that it did not arise out of the use of the vehicle as a motor vehicle.

With regard to the matter of attorney fees, we find that there has been enough controversy over the scope of the phrase "arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle" in MCL 500.3105(1); MSA 24.13105(1), that plaintiff's claim was not frivolous. Hence, we reverse the decision of the Court of Appeals with regard to whether personal injury inflicted during the theft of a vehicle arises out of the use of that vehicle as a motor vehicle, and we affirm regarding costs and attorney fees.

I

On the evening of June 26, 1989, plaintiff entered his parked car and found two men in the

back seat. These men forced him at gunpoint to drive to a church parking lot a mile away. One of the assailants then struck him in the face with his fist and threw him to the ground. The blow was so severe that plaintiff's cheekbone, nose, and septal area were broken. When plaintiff hit the ground, he also broke his ankle. The assailants then drove , away in the car. Subsequently, plaintiff filed a claim with defendant, his no-fault insurer. Defendant readily compensated plaintiff for the loss of his vehicle, but refused compensation for his personal injuries.

On May 30, 1990, plaintiff commenced this lawsuit, alleging that his injuries were compensable under the no-fault act, MCL 500.3101 *et seq.*; MSA 24.13101 *et seq.* Defendant filed a motion for summary disposition, contending that plaintiff's injuries did not arise out of the ownership, operation, maintenance, or use of the motor vehicle as a motor vehicle. On August 7, 1990, the court ruled in favor of defendant, finding that plaintiff's injuries did not arise out of the ownership or use of the motor vehicle. The court did, however, deny defendant costs and attorney fees on the ground that plaintiff's claim was not frivolous. The Court of Appeals reversed the grant of summary disposition and affirmed the denial of costs and attorney fees.[1] Defendant petitioned this Court for leave to appeal, which was granted on December 29, 1994.[2]

II

In this case, defendant was granted summary disposition pursuant to MCR 2.116(C)(10), which provides that "[e]xcept as to the amount of damages, there is no genuine issue as to any material

---

[1] 203 Mich App 341; 512 NW2d 80 (1994).
[2] 447 Mich 1048.

fact, and the moving party is entitled to judgment or partial judgment as a matter of law." When reviewing such a motion, we "consider the pleadings, affidavits, depositions, admissions, and any other evidence in favor of the party opposing the motion, and grant the benefit of any reasonable doubt to the opposing party." *Radtke v Everett,* 442 Mich 368, 374; 501 NW2d 155 (1993). Only if there is no genuine issue of any material fact is the moving party entitled to judgment as a matter of law. *Stevens v McLouth Steel Products Corp,* 433 Mich 365; 446 NW2d 95 (1989).

A

We find that summary disposition was appropriate. MCL 500.3105(1); MSA 24.13105(1) provides that an insurer is required to pay benefits where accidental bodily injury arises out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle.

Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter.

The Court of Appeals had an opportunity to apply this rule in the present case.

We believe that there is a direct causal relationship between the use of a motor vehicle as a motor vehicle and injuries sustained during a so-called carjacking. The physical assault only occurs because the assailants wish to take possession of the vehicle. Unfortunately, such incidents are nowadays within the ordinary risks of driving a motor vehicle. [203 Mich App 341, 344; 512 NW2d 80 (1994).]

We are persuaded, however, that the Court of Appeals reached the wrong conclusion.

Plaintiff's injuries arose out of the blows inflicted on him by a carjacker. Hence, plaintiff suffered a personal physical attack. Generally, such an attack is not compensable. See, e.g., *DAIIE v Higginbotham,* 95 Mich App 213; 290 NW2d 414 (1980), *Hamka v Automobile Club of Michigan,* 89 Mich App 644; 280 NW2d 512 (1979), and *O'Key v State Farm Mut Automobile Ins Co,* 89 Mich App 526; 280 NW2d 583 (1979).

In fact, this Court recently came to this very conclusion in *Thornton v Allstate Ins Co,* 425 Mich 643, 661; 391 NW2d 320 (1986). In *Thornton,* a taxicab driver picked up a customer. As he began to drive away from the curb, the customer drew a gun, shot him in the neck, and robbed him of his money. The injured driver then filed suit against the insurer of the cab, claiming that his injuries arose out of the use of the cab. However, this Court found:

> While the injuries [a gunshot wound to the neck] were perhaps "foreseeably identifiable" with the occupational or commercial use of a motor vehicle as a taxicab, the relation of the gunshot wound to the functional use of a motor vehicle as a motor vehicle was at most merely "but for," incidental, and fortuitous.

This Court arrived at a similar result in *Marzonie v ACIA,* 441 Mich 522, 534; 495 NW2d 788 (1992), in which the plaintiff claimed that his injuries arose out of the use of his car. Marzonie had had an argument with someone that ended when the person began shooting at Marzonie's car. Marzonie was hit and seriously injured. This Court found that the insurance company had no duty to cover Marzonie because his injuries did not arise

out of the use of this motor vehicle as a motor vehicle.

> In the present case, the testimony of the plaintiff clearly demonstrates that shots were fired during the continuation of an argument that had begun before the chase. The involvement of the automobiles was incidental and fortuitous. Although Mr. Oaks says that the plaintiff's car was moving toward him at a "creep," the shooting arose out of a dispute between two individuals, one of whom happened to be occupying a vehicle at the moment of the shooting.

Similarly, in *Auto-Owners Ins Co v Rucker,* 188 Mich App 125, 127; 469 NW2d 1 (1991), plaintiff was a victim of a drive-by shooting.

> In this case, the death arose from the firing of a shotgun. Although the vehicle made it easier for the criminals to approach the scene and to escape, its use was nonetheless incidental to the injury. One shudders to contemplate whether drive-by shootings have become foreseeable. It is, however, uncontestable that they are not identified with the normal use of a motor vehicle.

In *Higginbotham, supra* at 222, a woman was driving in her car when her estranged husband forced her to the side of the road with his vehicle. The husband then proceeded to shoot her numerous times while she was still in her car. The Court of Appeals found that "[a]n assault by an armed assailant upon the driver of a car is not the type of conduct that is foreseeably identifiable with the normal use of a motor vehicle."

Finally, in *Shaw v Allstate Ins Co,* 141 Mich App 331; 367 NW2d 388 (1985), a man and his wife were followed home by robbers. Before they could get out of their car, the robbers approached them

and shot the man while he still sat in the car. The Court of Appeals found that his death did not arise out of the use of his vehicle as a motor vehicle.

This decision denying coverage, along with the others, makes sense in light of the fact that

> [a]utomobile insurance spreads the risk of damages from automobile accidents among the insured population. The limitation on liability to damages "resulting from the ownership, maintenance or use of a covered auto" ensures that the risk spread is the risk of automobile accidents, and not all accidents, or more accurately, incidents, to which an automobile can be tied, however remotely. [*Aetna Casualty & Surety Co v United States Fidelity & Guaranty Co,* 806 F2d 302, 303 (CA 1, 1986).]

In the present case, plaintiff's injuries did not arise out of the use of his vehicle as a motor vehicle.[3] The carjacker simply struck plaintiff. Hence, plaintiff's vehicle was at best the situs of the injury, which is not a sufficient condition to establish the requisite causal connection between the injury and the vehicle. *Shinabarger v Citizens Mut Ins Co,* 90 Mich App 307, 314; 282 NW2d 301 (1979).

The Court of Appeals, however, did find this connection and cited *Gajewski v Auto-Owners Ins Co,* 414 Mich 968; 326 NW2d 825 (1982), for support. In that case, an incendiary device was attached to the ignition of the plaintiff's car. Unfortunately, the device exploded when the plaintiff attempted to start his car by turning on the igni-

___

[3] Although plaintiff cites *Saunders v DAIIE,* 123 Mich App 570; 332 NW2d 613 (1983), and *Mann v DAIIE,* 111 Mich App 637; 314 NW2d 719 (1981), for support, we are unpersuaded. We recognize that our citing of these cases in *Thornton* has created some confusion, however, we do not agree that assaults are part of "the normal risk" of motoring. Nevertheless, we are prepared to examine cases employing this methodology if and when we are presented with a case that raises the issue squarely.

tion. This Court found that his injuries *did* arise out of the use of his car because the turning on of a car's ignition is a normal activity associated with the use of a vehicle as a motor vehicle. This situation, however, is readily distinguishable from the facts in the present case, because plaintiff's injuries, unlike the turning on of an ignition, were not required to use the vehicle.

The Court of Appeals also improperly focused on the intent of the assailant.

> We believe that there is a direct causal relationship between the use of a motor vehicle as a motor vehicle and injuries sustained during a so-called carjacking. The physical assault only occurs because the assailants wish to take possession of the vehicle. [*Bourne, supra* at 344.]

As stated by this Court in *Thornton* and *Marzonie,* it is improper to use the intent of the assailant in order to create the causal connection. "We reject the focus that the Florida and Minnesota courts place upon the intent of the assailant as providing the requisite nexus between the injury and the use of the motor vehicle." *Thornton, supra* at 660, n 10. Further, " 'the proper focus is upon the relation between the injury and the use of a motor vehicle as a motor vehicle,' " not on " 'the intent of the assailant . . . .' " *Marzonie, supra* at 532, quoting 425 Mich 660, n 10.

Bourne's injuries did not arise out of the use of his vehicle as a motor vehicle. Hence, the Court of Appeals erred in reversing the trial court's granting of summary disposition on this issue.

B

Defendant also maintains that plaintiff's suit

was frivolous, and as a result it should be entitled
to attorney fees and costs.

> In addition, Farmers submits that the Court of
> Appeals opinion, for the most part, disregarded
> this Court's opinions in *Thornton* and *Marzonie*
> and relied on three opinions (*Gajewski, Saunders*
> [*v DAIIE,* 123 Mich App 570; 332 NW2d 613
> (1983)] and *Mann* [*v DAIIE,* 111 Mich App 637; 314
> NW2d 719 (1981)]) which had already been distin-
> guished from cases such as this one in *Thornton*
> and *Shaw* four or more years before the instant
> case was even filed.

Defendant is correct that if a claim is frivolous,
attorney fees may be awarded. MCR 2.114(F) pro-
vides:

> In addition to sanctions under this rule, a party
> pleading a frivolous claim or defense is subject to
> costs as provided in MCR 2.625(A)(2). The court
> may not assess punitive damages.

MCR 2.625(A)(2) provides:

> In an action filed on or after October 1, 1986, if
> the court finds on motion of a party that an action
> or defense was frivolous, costs shall be awarded as
> provided by MCL 600.2591; MSA 27A.2591.

In the present case, the Court of Appeals exam-
ined this issue and found

> [w]ith respect to defendant's issue on cross appeal,
> in light of our conclusion that the motion for
> summary disposition was improperly granted, it is
> clear that plaintiff's claim was not without merit.
> Accordingly, the trial court properly denied defen-
> dant's motion for costs and attorney fees. [*Bourne,*
> *supra* at 344.]

We are persuaded that the Court of Appeals reached the right conclusion. There has been much debate over the years regarding the scope of the phrase "arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle" in MCL 500.3105(1); MSA 24.13105(1). This fact is evidenced by the wealth of case law on this topic. Consequently, plaintiff's claim was not frivolous and defendant was properly denied its costs and attorney fees.

III

Plaintiff's injuries arose out of a physical attack, which is directly akin to *Thornton* in which no causal connection was found by this Court when a cabdriver was shot in the neck while driving his car. We conclude that under the facts of this case there was not a sufficient causal connection between plaintiff's injuries and the use of his motor vehicle as a motor vehicle to find liability on the part of defendant. Thus, there was no genuine issue with regard to defendant's liability and summary disposition was properly granted by the trial court. We also find that there was sufficient confusion in this area of law so as to prevent plaintiff's claim from being frivolous. Consequently, defendant was properly denied attorney fees and costs. Thus, the Court of Appeals decision reversing the trial court's granting of summary disposition in favor of defendant is reversed, and its decision denying defendant attorney fees is affirmed.

BRICKLEY, C.J., and CAVANAGH, BOYLE, MALLETT, and WEAVER, JJ., concurred with RILEY, J.

LEVIN, J. (*dissenting*). Plaintiff, Harry G. Bourne, was confronted, as he was entering his

automobile, by carjackers who were seated in the rear seat of the vehicle. He was forced at gunpoint to drive away. After driving a mile, he was ordered to stop and leave the vehicle. One of the carjackers struck him in the face, he fell to the ground, and was injured. The carjackers took his car keys and wallet, and drove away in his automobile.

Bourne commenced this action, seeking no-fault benefits from defendant, Farmers Insurance Exchange. The Court of Appeals, reversing an order of summary disposition entered by the circuit court, found that the physical assault occurred during the carjacking, said that "such incidents are nowadays within the ordinary risks of driving a motor vehicle," and concluded that Bourne was entitled to no-fault benefits.[1]

The majority concludes that Bourne's injury did not arise out of the "normal use" of his vehicle as a motor vehicle because it was the result of a "physical attack inflicted on" him.[2] The majority cites two decisions of this Court and five decisions of the Court of Appeals in support of its assertion that no-fault benefits are not payable for injuries suffered during a "personal physical attack."[3] None of the cases involved injuries inflicted during the theft of an automobile.

In two cases, the occupant of a vehicle was robbed (*Thornton v Allstate Ins Co,* 425 Mich 643; 391 NW2d 320 [1986],[4] and *Shaw v Allstate Ins Co,*

---

[1] 203 Mich App 341, 344; 512 NW2d 80 (1994).

[2] *Ante,* p 195.

[3] *Ante,* p 198.

[4] The opinion states that the assailants shot a taxicab driver, demanded money, and, after robbing the driver of approximately $15 in change, dragged him from the taxicab and stripped him of his shirt and coat.

141 Mich App 331, 332; 367 NW2d 388 [1985][5]), but there is no suggestion that the vehicle was stolen. In three cases, where the occupant of a vehicle was assaulted (*Marzonie v ACIA*, 441 Mich 522; 495 NW2d 788 [1992],[6] *Hamka v Automobile Club of Michigan*, 89 Mich App 644; 280 NW2d 512 [1979],[7] and *DAIIE v Higginbotham*, 95 Mich App 213; 290 NW2d 414 [1980][8]), personal acrimony between the assailant and the victim preceded the shooting, and the assailant made no effort to take possession of the vehicle occupied by the victim. Similarly, in the remaining two cases (*O'Key v State Farm Mut Automobile Ins Co*, 89 Mich App 526, 527; 280 NW2d 583 [1979],[9] and *Auto-Owners Ins Co v Rucker*, 188 Mich App 125; 469 NW2d 1 [1991][10]), involving drive-by shootings, there is no suggestion that the assailants sought to take possession of a vehicle. It appears that in the drive-by shootings, as in the three cases where the assault followed personal acrimony, there was an assault directed against the victim personally.

Bourne's injury was not the result of a "personal

[5] The opinion states that the plaintiff and her husband "were followed home by robbers who accosted her and her husband after she parked the vehicle in their driveway," and that her husband was "shot by the robbers while he was still sitting in the automobile."

[6] The victim and a passenger in one vehicle became embroiled in a dispute with the occupants of another vehicle. After words were exchanged, the victim pursued the other vehicle at a high rate of speed, and the passenger threw beer bottles at the other vehicle. Shots were fired as the victim's vehicle was approaching the home of an occupant of the other vehicle.

[7] Two days before the assault, the victim refused to allow the assailant to use his automobile.

[8] The assailant was the estranged husband of the victim. He pursued her automobile in his automobile, drove into the side of her vehicle, and shot her with a revolver.

[9] The victim was sitting in his automobile with the motor running when he was assaulted by a person who opened the passenger door and mumbled something like "let's go home."

[10] The victim was standing on the sidewalk when she was shot from a passing vehicle.

assault." What occurred here was a most impersonal assault. The carjackers had no interest in Bourne personally. They were not assassins bent on causing Bourne physical injury. Bourne was the chance victim of the desire of the carjackers to obtain a vehicle by carjacking—by seizing a vehicle from a motorist. Bourne was assaulted and physically injured only because he owned, operated, and used, and by so doing was in possession of, an automobile.

The majority, in citing cases in which the physical assault did not involve the theft of an automobile, blurs the distinction between a physical assault inflicted in the course of stealing an automobile from a person in possession (carjacking)—which manifestly *cannot occur* unless the victim owns, operates, or uses a vehicle—and a physical assault inflicted in or about an automobile expressive of personal hostility or in the course of a robbery, not involving theft of the automobile, that could as readily occur in a nonvehicular setting.

I

The question presented, in the words of the no-fault act, is whether Bourne suffered "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle."[11] I would hold that Bourne's injury

---

[11] (1) Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter.

(2) Personal protection insurance benefits are due under this chapter without regard to fault.

(3) Bodily injury includes death resulting therefrom and damage to or loss of a person's prosthetic devices in connection with the injury.

(4) Bodily injury is accidental as to a person claiming personal protection insurance benefits unless suffered intentionally

arose out of owning, operating, and using his motor vehicle as a motor vehicle, and that he is entitled to no-fault benefits.

Bourne's vehicle was not the place or locale of an assault growing out of personal animosity or nonvehicular theft. The vehicle itself was the subject of the robbery, as reflected by what the carjackers did.

There is no need to inquire whether the assailants "intended" to steal Bourne's vehicle. They, in fact, did so. Because the carjackers stole Bourne's vehicle, no-fault benefits should not be denied because in another case, where a vehicle is not in fact stolen, it might be unclear whether the assailants inflicted personal injury with the intent or purpose of stealing a motor vehicle.

The carjackers in the instant case in fact stole a motor vehicle being used by motorist Bourne. He was assaulted immediately after he operated and used his motor vehicle at the direction of the carjackers in the course of their theft of the vehicle. His injury occurred during and in the course of the theft of the vehicle, and no-fault benefits should be awarded.

A

In contrast with thefts and robberies of money and things generally—which can be committed almost anywhere, on the street, in a building, or in an automobile—only a person using a motor vehicle can be carjacked. This is because carjacking—

by the injured person or caused intentionally by the claimant. Even though a person knows that bodily injury is substantially certain to be caused by his act or omission, he does not cause or suffer injury intentionally if he acts or refrains from acting for the purpose of averting injury to property or to any person including himself. [MCL 500.3105; MSA 24.13105.]

stealing a motor vehicle from a person using a vehicle—can only be committed while the vehicle is being used. Carjacking, thus, is a risk peculiar to motoring, in contrast with thefts and robberies generally.

Because carjacking is peculiar to the use of automobiles, in contrast with thefts and robberies generally, it is, I believe, an activity whose costs are correctly allocated to motoring and covered by no-fault insurance. The commentary to the Uniform Motor Vehicle Accident Reparations Act states: "[T]he requirement that use of the motor vehicle be 'as a motor vehicle' qualifies the term so that both the tort exemption and the availability of basic reparation benefits are more nearly *limited to activities whose costs should be allocated to motoring* as part of an automobile insurance package." 14 ULA 47 (emphasis in original).

Carjacking has become as much a risk of driving as being subjected to projectiles hurled from an overpass (*Mann v DAIIE,* 111 Mich App 637; 314 NW2d 719 [1981]), or propelled through an automobile window (*Saunders v DAIIE,* 123 Mich App 570; 332 NW2d 613 [1983]).[12] Carjackings occur during the "normal use" of a motor vehicle. Indeed, they have become of such frequency that the Legislature recently defined carjacking as a new penal offense in an effort to discourage carjacking and punish carjackers.[13]

---

[12] In *Saunders,* the projectile was "either a rock or piece of concrete, which was thrown through the open passenger window of the automobile. The source of the projectile was never determined."

[13] Section 529a(1) was added to the Penal Code by 1994 PA 191 effective June 21, 1994, and provides:

A person who by force or violence, or by threat of force or violence, or by putting in fear robs, steals, or takes a motor vehicle as defined in section 412 from another person, in the presence of that person or the presence of a passenger or in the presence of any other person in lawful possession of the motor

Bourne's claim for no-fault benefits cannot properly be dismissed simply because his injuries arose out of a physical attack. If injury results from a physical attack that arises out of the ownership, operation, or use of a motor vehicle as a motor vehicle, no-fault benefits are payable.

The judicial responsibility of distinguishing between a physical attack that arises out of ownership, operation, or use of a vehicle as a vehicle and a physical attack that does not, cannot properly be avoided by the ipse dixit that no-fault benefits are not payable where the injury arises out of a physical attack.

### B

In *Thornton,* this Court contrasted the situations in *Mann* and *Saunders,*[14] where the injuries could not have occurred unless the injured person was occupying a motor vehicle, with the situation in *Thornton,* where the armed robbery and injury could have occurred without regard to whether the driver was using an automobile.

*Mann* and *Saunders* were discussed with apparent approval by this Court in *Marzonie v ACIA, supra,* pp 530, 531, and 534:

vehicle, is guilty of carjacking, a felony punishable by imprisonment for life or for any term of years. [MCL 750.529a(1); MSA 28.797(1)(1).]

[14] The Court of Appeals in *Saunders* said that in *Mann* "the Court noted an important distinction between an ordinary assault perpetrated upon one who by mere fortuity happens to be in an automobile and an assault which occurs when a projectile is propelled at a moving vehicle. In the latter case, the assault is directed at the automobile itself, rather than at the driver or passenger. Such an assault is, unfortunately, part of the normal risk of operating a motor vehicle and it must be considered foreseeably identifiable with the normal use of the vehicle. On the authority of *Mann v DAIIE, supra,* we hold that there was a direct causal relationship between Delores Saunders' injury and her use of the motor vehicle." *Saunders,* p 572.

*Saunders* and *Mann* are unlike *Thornton,* in
that the hazard experienced by those insureds was
directly tied to their use of a motor vehicle as a
motor vehicle. The relationship between that use
and the hazard is the key to *Saunders* and *Mann,*
not the subjective intent of the unidentified assail-
ants. [*Id.,* p 534.]

This Court added that unlike *Mann* and *Saunders,*
the harm that befell Marzonie was "not within the
ordinary risks of driving a motor vehicle"[15] be-
cause the gunshots were fired at Marzonie's vehi-
cle during the continuation of an earlier argument
between the assailant and Marzonie. The Court
observed that "the shooting arose out of a dispute
between two individuals, one of whom happened to
be occupying a vehicle at the moment of the
shooting." Because a personal altercation preceded
the gunshot aimed at the vehicle in which Marzo-
nie was riding, that was a personal assault.[16]

Bourne was unacquainted with the persons who
assaulted him. In contrast with *Marzonie,* Bourne
was not assaulted because of a personal dispute
with the assailants that began before the shooting.
This is not a case, like many in which no-fault
benefits were denied,[17] where it could be said that
the vehicle just happened to be the place where an
assault occurred—an assault that might have oc-
curred, because of the personal nature of the
dispute, at some other place. A carjacking can only
occur where there is a car. There is nothing per-
sonal about a carjacking.

---

[15] *Marzonie,* p 534.

[16] Benefits were denied in *Vasil v Zullo,* 238 NJ Super 572; 570 A2d
464 (1990), because the injuries suffered by the decedent occurred
when he left the vehicle and engaged in an argument with the driver
of another vehicle. The court concluded that "a verbal or physical
confrontation with the occupants of another vehicle is not part of the
normal use of an automobile." *Id.,* p 577.

[17] See ns 6-10.

II

The no-fault act requires that there be an "*acci-dental* bodily injury"—not a *traffic accident* bodily injury. The act provides that no-fault benefits shall be paid "for accidental bodily injury arising out of the *ownership, operation,* maintenance *or use* of a motor vehicle as a motor vehicle"—not only for injury arising out of a "*traffic accident* or mainte-nance" of a motor vehicle.

The majority blurs the distinction between a fault and no-fault system compensating for motor vehicle injuries in quoting approvingly the follow-ing statement in a case deciding whether the automobile insurer, rather than the general liabil-ity insurer, of a bus company was subject to liabil-ity for the bus driver's raping a handicapped pas-senger:

> Automobile insurance spreads the risk of dam-ages from *automobile accidents* among the insured population. The limitation on liability to damages "resulting from the ownership, maintenance or use of a covered auto" ensures that the risk spread is the risk of *automobile accidents,* and not all acci-dents, or more accurately, incidents, to which an automobile can be tied, however remotely. [*Aetna Casualty & Surety Co v United States Fidelity & Guaranty Co,* 806 F2d 302, 303 (CA 1, 1986). Emphasis added.]

While the wording of the no-fault act—"acciden-tal bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle"—is drawn from pre- or non-no-fault automobile liability policies that use similar language, the intent of the draftsmen of the UM-VARA and of legislatures enacting no-fault acts was to broaden the coverage beyond injuries arising

from traffic or automobile accidents to include other accidental injuries. Because coverage had been broadened beyond what was provided in pre- or non-no-fault automobile liability policies, the words "as a motor vehicle" were added in the UMVARA and other no-fault acts to limit coverage to "activities whose costs should be allocated to motoring as part of an automobile insurance package."[18]

The majority gratuitously casts doubt on the continuing viability of the decisions of the Court of Appeals in *Mann* and *Saunders* which were cited approvingly in *Thornton* and *Marzonie*.[19] In *Mann*, the Court of Appeals distinguished between an assault arising out of personal acrimony (*Higginbotham*[20] and *Hamka*[21]) or focused against the victim personally (*O'Key*[22]) and the case before it where an unidentified person threw a stone at Mann's vehicle from an overpass as Mann was driving along a Detroit expressway. The stone hit the windshield; Mann claimed he turned his neck sharply in a reflex action and sustained neck and shoulder injuries. The Court said:

> This case, however, presents a different factual situation [than *Higginbotham, Hamka,* and *O'Key*]. In today's society, unfortunately, there are unbalanced individuals who take perverse enjoy-

---

[18] 14 ULA 47, § 1, comment.

[19] The majority states:

> We recognize that our citing of these cases in *Thornton* has created some confusion, however, we do not agree that assaults are part of "the normal risk" of motoring. Nevertheless, we are prepared to examine cases employing this methodology if and when we are presented with a case that raises the issue squarely. [*Ante,* p 200, n 3.]

[20] See n 8.

[21] See n 7.

[22] See n 9.

ment out of dropping rocks and other objects on automobiles as they pass under overpasses on expressways. In recognition of this hazard, traffic engineers often design overpasses with protective fencing. This type of assault is directed at the automobile itself, not the driver. It happens only *because* the automobile is passing under the overpass at the appointed time. There is a direct causal relationship between the driving of the vehicle and the assault. In this case, if the plaintiff had not been driving his automobile, he would not have been assaulted. Injuries sustained as a result of the assault, therefore, arise out of the operation and use of the motor vehicle as a motor vehicle. [*Id.,* pp 639-640. Emphasis in original.]

In stating that the assault "is directed at the automobile itself, not the driver," the Court was seeking to explain the difference between an assault arising out of personal acrimony or directed against the victim personally, and a random act of violence resulting in injury to occupants of a motor vehicle that would not have been suffered if they had not been occupying a motor vehicle.

Where it cannot be said that the assailant might as easily have chosen to direct his animus against the victim at some other time or place, where the assault is random and is not directed against the victim personally, and the only reason the victim is at the place where the assault occurred is because he is using (including as an occupant) a motor vehicle, the assault arises out of the use of a motor vehicle without regard to whether there is a collision after the driver loses control of the vehicle or the injury, as in *Mann,* is suffered without a collision.

III

I agree with the majority that the intent of the actor is not relevant. No-fault benefits are due

"without regard to fault."[23] Intentionality disqualifies from benefits only a person who intentionally caused the injury.[24]

### A

⸳ Because the *intent* of the actor is not a factor, the felonious intent of the carjackers does not disqualify Bourne from receiving no-fault benefits. But their *purpose* in assaulting Bourne may be relevant. If the purpose was money or vengeance[25] (or, possibly, if it was sex), benefits probably should not be awarded. Here the purpose, as reflected by *what the carjackers did,* was to steal the vehicle. Bourne was assaulted and injured because he was a motorist using and in possession of a vehicle, and perforce his injuries were a result of using the vehicle, without regard to either the intent or purpose of the carjackers.

Inquiring, as stated in *Marzonie,*[26] whether what occurred was "within the *ordinary risks* of driving a motor vehicle" (emphasis added), is similar to an inquiry, as stated by the majority, whether the injury arose out of the "normal use" of a vehicle.[27]

A carjacking is indeed an unusual event, but carjackings do occur during the "normal use of a motor vehicle." Bourne was engaged in the normal use of his vehicle when he entered the vehicle. Although what occurred after he entered the vehicle was unusual, so too are many accidents for

---

[23] See § 3105(2); text at n 11.

[24] See § 3105(4); text at n 11.

[25] See ns 6 and 10.

[26] The Court of Appeals in the instant case concluded that carjacking is "nowadays within the *ordinary risks* of driving a motor vehicle." (Emphasis added.)

[27] *Ante,* p 195.

*Saunders, supra,* p 572. Similarly, see *Rucker, supra,* p 127 (quoted approvingly), *ante,* p 199.

which recovery of no-fault benefits may be obtained. Being struck by a motorist fleeing from the police is unusual, not normal, but surely is a cost correctly allocated to motoring.[28]

Because motorists fleeing the police or driving while intoxicated or recklessly[29] are all engaged in intentional and criminal activity that is not normal, and no-fault benefits are nevertheless recoverable by victims of such errant driving, there is no exception for injury that results from intentional or criminal or abnormal activity.

The use of firearms by the actor—pointing a gun in the instant case—can be seen as distinguishing this case from errant driving. In *Thornton,* a customer of a taxicab driver shot the driver in the neck and robbed him of money. But, as observed by the majority,[30] the risk in *Thornton* could be seen as the result of "the occupational or commercial use of a motor vehicle as a taxicab." *Id.,* p 661. I concurred in *Thornton* on that basis.[31] The risk of

---

[28] The New Jersey Supreme Court, in *Lindstrom v Hanover Ins Co,* 138 NJ 242; 649 A2d 1272 (1994), recently awarded no-fault benefits for injuries caused by a drive-by shooting. The court observed that "the automobile did more than provide a setting or an enhanced opportunity for the assault." *Id.,* p 252. Rather, "the assailant would not likely have committed such an act of apparently random violence without the use of a car." *Id.*

The New Jersey Supreme Court said:

Perhaps more to the point, however, is the depressing reality that in recent years . . . drive-by shootings have become an increasingly-common part of the American experience. Regrettably, a court can no longer say with any certainty that such occurrences are so removed from the American scene as not to be foreseeable. [*Id.,* pp 252-253.]

[29] See *People v Tims,* 449 Mich 83; 534 NW2d 675 (1995), in which the motorists were in a drag race resulting in criminal prosecution for murder, and conviction of negligent homicide with a motor vehicle.

[30] *Ante,* p 198.

[31] In the instant case, the taxi was like a convenience store.

ordinary robbery not involving theft of the vehicle is a risk whose cost is not allocable to motoring.

There is as much reason for the Legislature to socialize losses resulting from carjackings through a no-fault system as there is to socialize the cost of injuries caused by thieves fleeing the police. In both cases, the victim is injured as a result of using his vehicle as a vehicle when the thief adventitiously chances on the victim's vehicle.

B

In *Smaul v Irvington General Hosp,* 108 NJ 474; 530 A2d 1251 (1987), the New Jersey Supreme Court affirmed an award of no-fault benefits in a carjacking case. The court said:

> "It is an unfortunate truth that in these times the sort of attack to which plaintiff was subjected is not uncommon" [citation omitted]—that is, as stated by the trial court, "it is foreseeable that a driver of a car will, at times, stop for directions while operating his vehicle and that in doing so he may be injured as a result of an assault by another." [*Id.,* p 478.]

The New Jersey Supreme Court distinguished the facts in *Smaul* from the facts in *Uzcatequi-Gaymon v New Jersey Manufacturers Ins Co,* 193 NJ Super 71; 472 A2d 163 (1984). In *Uzcatequi-Gaymon,* the victim was shot while using a pay

Thieves recognize that taxis, like convenience stores, are potential sources of cash because taxi drivers generally carry cash to operate their businesses. I would, to decide this case, conclude that an assault on a person who generally carries cash to conduct business is not a risk associated with motoring, but is a risk of such a business. That risk of a cash business is not a risk whose cost shall be allocated to motoring. [*Thornton v Allstate Ins Co, supra,* p 665 (LEVIN, J., concurring).]

phone and holding the car keys for his nearby automobile in his hand.[32] The court in *Smaul* said:

> Although the fact that Smaul stopped for directions and remained seated in his car, hence directly involving the use of his automobile, serves to distinguish this case from *Uzcatequi-Gaymon,* we need not rest on that feature alone to find liability for PIP benefits in this case. Here there was *direct involvement of the automobile* in the accident: plaintiff sought directions so that he could drive his car to his destination, he was sitting in his car when the assault occurred, and a *purpose of the assailants*—not emphasized by either court below but acknowledged in Allstate's Statement of Facts—*was to steal the car after yanking plaintiff out of the driver's seat.* The effort to take the automobile removes, for us, any doubt about this case falling within the statutory requirements of an "accident involving an automobile." *Surely the automobile was not merely coincidental to the critical events or a mere "attending circumstance": its role was central to the incident.* [*Id.,* p 478. Emphasis added.]

The carjacking in *Smaul* and the carjacking in the instant case occurred during the normal course of operating a motor vehicle, and the injuries in both cases occurred during the carjacking—

---

[32] The New Jersey appellate court denied coverage because it found an insufficient causal connection between the shot fired by the plaintiff's attackers and the automobile. 193 NJ 75. The court concluded:

> [I]n our view, while theft of the automobile may have been the ultimate object of the attack, from a legal viewpoint the automobile was not the cause of decedent's injuries and death. Rather, the cause of his injuries and death was the act of robbery committed by his assailants. That the automobile was the object of the robbery was merely an attending circumstance and did not transform this incident into "an accident involving an automobile" within the meaning of the New Jersey . . . no-fault law . . . . [*Id.,* p 73.]

theft of a motor vehicle from a person using a motor vehicle—rather than during an ordinary street robbery.

C

It is not consequential whether a victim of carjacking suffers injury as a result of being forced out of the vehicle[33] by the carjackers,[34] or escaping from the vehicle while it is moving, or, as here, being assaulted by the carjackers shortly after the vehicle came to rest.[35]

[33] Nor is it consequential that the injury may be seen as having occurred outside the vehicle. In *Miller v Auto-Owners Ins Co*, 411 Mich 633; 309 NW2d 544 (1981), this Court held that the plaintiff was entitled to no-fault benefits for injuries arising out of the maintenance of a motor vehicle when his automobile fell on his chest as he was replacing shock absorbers. In *Ottenwess v Hawkeye Security Ins Co*, 408 Mich 164; 289 NW2d 708 (1980), no-fault benefits were recovered when a worker was crushed to death while examining or repairing an apparent malfunction of the mechanism that raised and lowered the dump box on a dump truck when the dump box suddenly came down on him, trapping him between the box and the frame of the truck. In *Bialochowski v Cross Concrete Pumping Co*, 428 Mich 219; 407 NW2d 355 (1987), no-fault benefits were recovered for injuries suffered when a thirty- to thirty-five foot boom permanently attached to a truck exploded, causing the boom to collapse on a worker and crush him.

I have not searched for cases where injuries were suffered in the immediate vicinity of the vehicle, as distinguished from the cases cited where the vehicle or device attached to the vehicle struck the injured person. Having in mind that the inquiry is whether the injury resulted from the use of the vehicle as a vehicle, on principle I would not distinguish between an injury caused by the vehicle itself or a device attached to the vehicle on the one hand, and an injury in the immediate vicinity of the vehicle on the other.

[34] In *Smaul*, the victim stopped his vehicle to ask for directions, was pulled from the vehicle, and, after his cash was taken, was stabbed when he resisted turning over the vehicle. *Id.*, pp 475-476.

[35] The majority may, of course, decide to reserve to another time the question whether persons assaulted by carjackers while they are in the vehicle, or forced out of the vehicle, or injured escaping from the vehicle while it is moving, are entitled to no-fault benefits.

A distinction could also be drawn on the basis of whether the injury was caused by a weapon, by physical force (as in the instant case where Bourne was pummeled), or by the vehicle striking another vehicle or a pole, or as a result of being forced out of or escaping from the vehicle.

Such fine-line distinctions might appear to provide some apparent consistency in decision making, but would not be rooted in any principled exegesis of the policies of the no-fault act. Unless the majority is prepared to announce that injuries that result from intentional or criminal acts are not covered by the no-fault act—which it clearly cannot do consistent with the provisions of the act—Bourne is entitled to recover for the physical injuries that resulted from the physical assault on him, albeit outside his vehicle, in connection with its theft from him, a motorist *using* his vehicle.